IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SAAB ENTERPRISES, INC., dba ENJOY
FOODS INTERNATIONAL, a California
corporation,                                          CV-06-774-ST
                        Plaintiff,
                                                OPINION AND ORDER

     v.

BRUCE PACKING COMPANY, INC., dba
BRUCE PAC, an Oregon corporation, ,

                        Defendant.

STEWART, Magistrate Judge:

## **BACKGROUND**

    Plaintiff, Saab Enterprises, Inc., doing business as Enjoy Foods International ("Enjoy"), is

a California corporation with its principal place of business in California.  It is in the business of

manufacturing and distributing jerky and other snack foods.  Defendant, Bruce Packing

Company, Inc., doing business as BrucePac ("BrucePac"), is an Oregon corporation with its

principal place of business in Woodburn, Oregon.  It is in the business of manufacturing meat

and poultry products.  BrucePac is owned by JDB Holdings, Inc. ("JDB").  Ferreira International,

Ltda. ("Ferreira Int'l") is a Brazilian entity 90% owned by JDB and 10% owned by Mr. Flavio Ferreira ("Ferreira"), a citizen of Brazil. Ferreira Int'l manufactures and processes beef jerky products at its facilities in Brazil. BrucePac uses its Brazilian affiliate, Ferreira Int'l, to produce beef jerky to be imported and distributed in the United States.

On April 8, 2005, Enjoy and BrucePac entered into a contract under which BrucePac agreed to manufacture for Enjoy approximately 40,000 pounds of beef jerky per month "at Bruce Pac's manufacturing/processing plant located in Brazil." Complaint, Exhibit A ("Contract"), ¶ 1. After early November 2005, for reasons that are disputed in this lawsuit and discussed below, BrucePac ceased producing beef jerky for Enjoy. On May 31, 2006, Enjoy filed this case, alleging three claims against BrucePac for: (1) breach of contract (First Claim for Relief); (2) breach of implied and statutory covenants of good faith and fair dealing (Second Claim for Relief); and (3) breach of implied warranty (Third Claim for Relief).

The amount in controversy exceeds $75,000 and is between parties with diverse citizenship. Thus, this court has jurisdiction pursuant to 28 USC § 1332. The Contract provides for exclusive venue in this court. Contract, ¶ 6. On September 11, 2007 (docket #60), all parties filed written consents to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

Now before this court is defendant's Motion for Summary Judgment (docket #29).[1] For the reasons that follow, the motion is denied.

///

---

[1] This court previously denied the accompanying Motion to Exclude the Testimony of Joe Anderson (docket #37). *See* Minute Order dated August 1, 2007 (docket #58).

## FACTS

The following undisputed facts are gleaned from the parties' submissions:

## I.  The Parties

Enjoy is in the business of manufacturing and distributing jerky and other snacks. BrucePac is in the business of manufacturing meat and poultry products, and does so through Ferreira Int'l at facilities in Brazil for importation and distribution in the United States.  Bruce Depo, p. 42.

## II.  Food Safety Regulations and Guidelines

At all relevant times, including April 2005 when the parties executed their Contract, federal regulations required cooked beef products to be produced using processes ensuring certain performance standards, including the following "lethality" standard:

> (1) Lethality.  A $6.5\text{-log}_{10}$ reduction of Salmonella or an alternative lethality that achieves an equivalent probability that no viable Salmonella organisms remain in the finished product, as well as the reduction of other pathogens and their toxins or toxic metabolites necessary to prevent adulteration, must be demonstrated to be achieved throughout the product.  The lethality process must include a cooking step.  Controlled intermediate step(s) applied to raw product may form part of the basis for the equivalency.

9 CFR § 318.17(a)(1).

The USDA Food Safety and Inspection Service ("FSIS") promulgated food safety guidelines for the elimination of salmonella and other pathogens specifically applicable to jerky products in March 2004.  The promulgated lethality standards required the introduction of humidity into the cooking process, as described and interpreted in Appendix A, under USDA regulations.  Adrian Decl, Exhibit 3.  Appendix A, published by the USDA in 1999, provides

several options for meeting the humidity requirements for lethality.  One of the options is for the

producer to seal its ovens for over 50 percent of the cooking time of the jerky.  *Id* at 3.  This sealing

can be achieved by closing the oven dampers and/or shutting the exhaust.  Adrian Decl, ¶ 4.

Prior to February 2006, Enjoy used a two-stage cooking process with the dampers open

all the time.  Quinzon Depo, p. 44.  Enjoy's President, Waleed Saab ("Saab"), believed that

Enjoy was not required to close the oven dampers in the production of their beef jerky.  Saab

Depo, pp. 191-92.

## III.  __The Contract__

In about March 2005, Saab was searching for a meat products producer in Brazil to

manufacture Enjoy's beef jerky products.  The high price of beef in the United States was forcing

processors to source beef elsewhere.  Saab Depo, p. 104.  A third party referred Saab to BrucePac

and Ferreira Int'l.  *Id* at 105.

Larry Bruce ("Bruce"), the Chief Executive Officer of BrucePac, met with Saab and

Ferreira in Brazil about the middle of March 2005.  Saab toured Ferreira Int'l's manufacturing

facilities located in Sola, Brazil, and observed the process used by Ferreira Int'l to produce beef

jerky.  Bruce Depo, pp. 66-67; Ferreira Depo, p. 63.  Saab verbally described the process Enjoy

used to manufacture its beef jerky, explaining that it was "almost the same" process used by

Ferreira Int'l, but declined to disclose Enjoy's formula until there was a signed agreement.  Bruce

Depo, p. 77; Saab Depo, pp. 115-16; Ferreira Depo, p. 64.  Saab also said that all the ingredients

for Enjoy's beef jerky were available in Brazil, although he had not specifically researched that

fact.  Bruce Depo, p. 69; Saab Depo, pp. 128-31.

Thereafter, the parties began negotiating the terms of a written contract. BrucePac and Enjoy exchanged several drafts of a contract and both parties made changes to the terms. Saab Depo, pp. 121, 123-34. On April 8, 2005, the parties executed the Contract.

At Saab's insistence, the Contract required BrucePac to manufacture Enjoy's beef jerky in Brazil "strictly in accordance with Enjoy's formulas/recipes and Enjoy's procedures." Contract, ¶ 1; Saab Depo, p. 140. In addition, the Contract required that "[a]ll beef jerky shall be manufactured by BrucePac pursuant to the United States Department of Agriculture (USDA) standards, and shall be so certified by the release of the product by USDA at port of entry." Contract, ¶ 4. The initial term of the Contract was nine months from April 8, 2005. *Id*, ¶ 12.

## IV. Information About Cooking Cycles

The Contract states that copies of Enoy's "formulas/recipes and procedures" were attached to and incorporated into the Contract. *Id*, ¶ 1. However, those formulas/recipes and procedures were not attached to the Contract and BrucePac received no additional information about Enjoy's beef jerky until April 19, 2005, when Saab transmitted a package that included USDA label information and ingredient lists for the three varieties of beef jerky covered by the Contract. Bruce Decl, ¶¶ 4-5. Information about Enjoy's cooking cycle and drying procedures was not provided. *Id*, ¶ 5.

The following day, April 20, 2005, Ferreira emailed detailed research and development sheets ("the April 2005 R&D sheets") to Saab showing how Ferreira Int'l would prepare the test samples of Enjoy's beef jerky products. Adrian Decl, Exhibit 4, p. 1. The April 2005 R&D sheets detailed the cooking cycle and drying process to be used, which was the cooking cycle used by Ferreira Int'l to produce all of BrucePac's jerky. The same cooking cycle was

demonstrated to Saab when he toured the Ferreira Int'l plant in March 2005.  Bruce Decl, ¶ 6.

The cooking cycle used by Ferreira Int'l to produce BrucePac's jerky meets the relevant food

safety requirements specified under USDA regulations applicable to jerky products and, thus,

allows BrucePac to export its jerky products from Brazil into the United States.  Bruce Decl, ¶ 3;

Adrian Decl, ¶¶ 9, 10.

Even though Ferreira asked Saab to "[l]et us know if you have any questions or

comments on this document," Saab said nothing about the cooking cycle after he received the

April 2005 R&D sheets, and does not recall if he gave a copy of those documents to Enjoy's

plant manager "who is very experienced in the production of beef jerky."  Saab Depo, pp. 141-

43.  Saab reviewed the April 2005 R&D sheets carefully, but regarding the cooking cycle stated

in those documents, did not know "if this is what we use or this is what they used."  *Id* at 142.

**V.  Performance Under the Contract**

Soon after the parties executed the Contract, BrucePac and Ferreira Int'l discovered that

some of the specific ingredients used by Enjoy to make its beef jerky, in particular a specific type

of preservative-free Kikkoman sauce, were not available in Brazil and could not be imported into

Brazil.  *Id* at 131-33, 145, 151.  The parties agreed to use substitute ingredients sourced in Brazil

which BrucePac agreed to arrange for Enjoy.  *Id* at 152-53, 155.  BrucePac and Ferreira Int'l used

the substitute ingredients from April through August 2005.  *Id* at 154-55, 163-64.

Between April and mid-August 2005, Ferreira Int'l apparently produced samples of jerky

for Enjoy, which Saab determined were getting "closer in texture and color" to Enjoy's products,

but still needed "work on the flavor."  Edelson Decl, Exhibit 7.  In early August 2005, Ferreira

Int'l produced a batch of samples of each of the three flavors of Enjoy's beef jerky, again using

BrucePac's cooking cycle.  Saab Depo, pp. 163-66; Quinzon Depo, pp. 56-57.  Enjoy provided

feedback regarding this test batch, stating that the samples were improving, but still needed some

adjustments.  *See* Kelly Decl, Exhibit 5, discussed at Saab Depo, pp. 165-66.  Again, Enjoy

raised no objection or concerns about the cooking cycle.

About August 16 or 18, 2005, Enjoy and BrucePac agreed that BrucePac would produce

another trial order consisting of 500 pound batches of each of the three flavors of beef jerky.

Saab Depo, pp. 167, 169-70.  The parties also agreed that BrucePac would begin producing 2,000

pound batches of each flavor per week until the final modifications to Ferreira Int'l's production

of the beef jerky were approved by Saab.  *Id* at 167-68.  Due to a delay in receiving the necessary

spices, BrucePac produced 2,500 pounds of each flavor for the first batch and shipped them on

September 17, 2005.  *Id* at 172, 175.

By mid-October 2005, approximately 19,000 pounds of beef jerky produced by Ferreira

Int'l, using the substitute ingredients, had been delivered to Enjoy.  *Id* at 197-98.  Problems

appeared with some of that jerky, although Saab did not know what cooking cycle has been used

to produce that jerky.  *Id* at 178-79.  Enjoy rejected nearly 25% of this production of jerky.  *Id* at

196-97.  BrucePac and Ferreira Int'l continued to use BrucePac's cooking cycle for the

production of the jerky that was imported and delivered to Enjoy.  Bruce Decl, ¶ 8.

About October 14, 2005, when Saab was trying to determine the cause of the "salting-

out" and "white spots" problems, he questioned how Ferreira Int'l cooked Enjoy's jerky.  Saab

Depo, pp. 185-86.  Ferreira immediately responded by email and sent the cooking cycle used to

produce Enjoy's jerky.  *Id* at 190.  Saab then shared the cooking cycle information with his plant

manager, Dennis Quinzon ("Quinzon").  Saab and Quinzon learned that the cooking cycle used

by Ferreira Int'l to produce Enjoy's jerky was different from the cooking cycle that Enjoy used to produce its own jerky. *Id* at 191-92.

Saab gave Quinzon a copy of the April 2005 R&D sheets from Ferreira for Quinzon to compare to Enjoy's cooking and drying cycle. Quinzon Depo, pp. 32-33. Quinzon observed that the cooking and drying cycles were different and informed Saab about the difference. Although Saab asked Quinzon to determine whether the cooking and drying cycles matched, Quinzon did not communicate with his counterpart at Ferreira Int'l. *Id* at 45 ("All the correspondence and everything was handled by [Saab] who was personally involved in it.").

Saab then told Ferreira Int'l and BrucePac that he wanted Enjoy's jerky produced with the dampers open all of the time. Saab Depo, p. 192 ("Yes, I told them I prefer to keep the damper open, see the result"). This "open damper" method of cooking violates the USDA regulations regarding preparation of jerky products.[2]

Saab continued to push BrucePac for more production, even though a significant amount of the initial production run of Enjoy's jerky was rejected. Saab Depo, p. 187. Bruce decided that BrucePac and Ferreira Int'l needed to stop production runs and deal with the problems causing rejection of the jerky. Bruce Decl, ¶ 9; Ferreira Depo, p. 215.

## VI. Saab's Visit to Brazil and Production of the "Test Deviation"

By late October 2005, BrucePac learned that it was losing money producing jerky for Enjoy at the contract price. Edelson Decl, Exhibit 9. On November 1, 2005, BrucePac informed Enjoy that given the unacceptable product variation, production could not continue until the

---

[2] At oral argument, the parties indicated that an upward adjustment of the cooking temperature may allow cooking the jerky with the damper closed for a shorter period of time. Whether the regulations allow the jerky to be cooked with the dampers open at all times based on adjustments to the cooking times or temperature is not clear, and in any event would apparently require scientific validation for approval. Adrian Decl, ¶ 10; Ferreira Depo, p. 238.

problems were resolved.  Saab objected and expressed his frustrations.  Saab Depo, pp. 199-201.

Thereafter at Saab's request, arrangements were made for him to supervise a test production run

of Enjoy's jerky at Ferreira Int'l's facilities in Brazil.  *Id* at 205-06.

On November 7, 2005, Saab supervised the production of approximately 3,000 pounds of

Enjoy jerky at the Ferreira Int'l plant in Brazil.  *Id* at 232-33.  Bruce told Ferreira to do whatever

Saab wanted to produce that batch of jerky.  Bruce Decl, ¶ 10.  Saab instructed Ferreira to

process the jerky using Enjoy's cooking cycle, but Ferreira informed Saab that the cooking

process was illegal.  Saab agreed to increase the cooking temperature to create a "test deviation"

to permit export of the product.  Ferreira Depo, 221-22.

Ferreira Int'l prepared an R&D sheet for each of the three varieties of Enjoy jerky

produced on November 7, 2005 (the "November 2005 R&D sheets").  Each of the November

2005 R&D sheets shows that the jerky was prepared using Enjoy's (pre-February 2006, two

stage, open damper) cooking process.  Adrian Decl, Exhibit 2, pp. 7-9.  However, Ferreira

testified that Ferreira Int'l processed the "test deviation" with "the damper closed for enough

time to meet the USDA regulation . . . and the minimal meat internal temperature

[requirements]."  Ferreira Depo, p. 222.

Because the cooking cycle used to process the beef jerky prepared under Saab's

supervision did not conform to USDA lethality regulations, the jerky could not be legally sold in

the United States.  Quinzon Depo, pp. 82-83, 86; Adrian Decl, ¶¶ 3, 5.  BrucePac received that

jerky in mid-December 2005.  The jerky was quarantined in BrucePac's warehouse facility in

Woodburn, Oregon where it is currently held in retention.  Bruce Decl, ¶ 11.

On January 10, 2006, Enjoy's attorney sent a letter to BrucePac demanding performance

under the Contract.  Supplemental Kelly Decl, Exhibit 6.  Approximately a month later, a USDA

inspector visiting Enjoy's plant notified Quinzon that Enjoy's two-stage, open damper cooking cycle violated the USDA regulations.

By May 2006, Enjoy filed this lawsuit, alleging breach of the Contract and related claims.

## ANALYSIS

## I. Impracticability

The Contract is governed by Oregon law, including its Uniform Commercial Code. Contract, ¶ 6.

### A. Legal Standard:  Impracticablity Under Oregon's  UCC

Under Oregon law, the following standard applies to claims of impracticability:

> Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:
>
> (1) Delay in delivery or *nondelivery* in whole or in part . . . *is not a breach* of duty under a contract for sale *if performance as agreed has been made impracticable* by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or *by compliance in good faith with any applicable foreign or domestic governmental regulation or order*[3] whether or not it later proves to be invalid.
>
> (2) Where the causes mentioned in subsection (1) of this section affect only a part of the seller's capacity to perform, the seller must allocate production and deliveries among customers but may at the option of the seller include regular customers not then under contract as well as the requirements of the seller for further manufacture. The seller may so allocate in any manner which is fair and reasonable.

ORS 72.6150 (1) and (2) (emphasis added).

### B. Analysis

BrucePac argues that its performance in accordance with the specific terms of the Contract was impracticable as a matter of law.  Specifically, BrucePac contends that Enjoy's (pre-February 2006, two-stage, open damper) cooking cycle did not meet USDA requirements

---

[3]  BrucePac disavows any reliance on that portion of the statute discussing the "occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made."  Defendant's Reply Memorandum in Support of Summary Judgment Motion (docket #53), p. 7.  This court therefore limits its consideration to the issue of whether BrucePac's performance is excused due to its compliance in good faith with a domestic governmental (USDA) regulations.

and that BrucePac reasonably refused to produce jerky using that cooking cycle after November 2005. At oral argument on this motion, it became clear that BrucePac's impracticability argument hinges on its interpretation of the demand letter sent to BrucePac by Enjoy's attorney on January 10, 2006. After carefully reviewing the evidence, with particular regard to all reasonable inferences which may be drawn from that letter, this court rejects BrucePac's bid for summary judgment on the basis of impracticability.

BrucePac's argument hinges on two premises, namely that: (1) the cooking cycle used by Enjoy prior to February 2006 violated the USDA regulations; and (2) the January 10, 2006 letter from Enjoy's attorney insisted that BrucePac use Enjoy's allegedly illegal (pre-February 2006, two-stage, open damper) cooking cycle in preparing jerky under the Contract.

It is not entirely clear that the process used to prepare the "test deviation" was in fact illegal. The R&D Sheets on the November 2005 "test deviation" indicate that the jerky was prepared with the damper (dumper) "open." However, Ferreira testified that the "test deviation" was prepared with the "damper closed for enough time to meet the USDA regulation . . . and the minimal meat internal temperature to 79.4." Ferreira Depo, p. 222. He also testified that the process used was "legal, but you could not reproduce it because it was a deviation from the original specifications," and that a new specification could be written that included the deviation if the product had been received in the United States and accepted by the customer. *Id* at 238. The November 2005 jerky produced as a "test deviation" apparently reached BrucePac's Oregon plant some time in December 2005, but was then quarantined based on the information in the R&D Sheets which show the damper open and the oven temperature at 60-66°C during two drying cycles. It strains credulity that the USDA inspector in Brazil would approve preparation of a "test deviation" using a cooking cycle and temperature combination that was known to be illegal, and Ferreira's testimony is at odds with the information contained in the November 2005 R&D Sheets. Viewed in the light most favorable to Enjoy, the available evidence lacks support

for the contention that anyone involved in producing the November 2005 "test deviation" believed that the process used would not pass muster under the USDA regulations.

However, for purposes of this motion, this court assumes that the cooking cycle used to prepare the "test deviation" of jerky during the first week of November 2005 was illegal. Even so, the second premise of BrucePac's argument falters. Evidence is lacking that prior to sending the demand letter on January 10, 2006, Saab knew or should have known that the cooking cycle used by Ferreira Int'l to prepare that jerky was illegal.

First, there is no evidence in the record that prior to October 14, 2005, Saab knew or reason to know that Enjoy's cooking cycle differed in any significant or material way from the one used by Ferreira Int'l when preparing BrucePac products. Instead, Saab believed that process used by Ferreira Int'l was "almost the same" as that used by Enjoy. The first indication that Saab became aware of a potentially significant difference was in mid-October 2005 when Saab asked Quiznon to compare the information sent by Ferreira in the April 2005 R&D sheets to the cooking cycle used by Ferreira Int'l. Within weeks of discovering the difference in the cooking cycles, Saab visited the Ferreira Int'l plant in Brazil and assisted Ferreira Int'l in producing the "test deviation." At that time, he told Ferreira that he wanted the jerky prepared using Enjoy's cooking cycle, but authorized Ferreira Int'l to modify that process after Ferreira informed him that using Enjoy's cooking procedures would be illegal.

Between the date of the "test deviation" run on November 7, 2005, and the demand letter from Enjoy's attorney dated January 10, 2006, the record contains little or no communication between the parties, other than payment requests from BrucePac to Enjoy. At oral argument, counsel for BrucePac pointed to a December 14, 2005 letter from BrucePac to Saab (Edelson Decl, Exhibit 25) as evidence of BrucePac's ongoing efforts to perform or offer a solution (in the form of Enjoy purchasing BrucePac's existing inventory of jerky) to the ongoing difficulties. However, that letter was sent on the heels of communications from Ferreira seeking to "kill the deal" and is full of conclusory statements by BrucePac about the alleged contents of "recent

telephone conversations," including that the parties had "entered into a non-written R&D
arrangement."  Its second paragraph implies that there was no existing contractual relationship,
but that the parties would have to await arrival of the jerky from the "test deviation" before they
could discuss whether they could "put together a contract for production of [Enjoy's] jerky. . . ."
These statements are obviously at odds with Enjoy's position – equally supported by the
evidence – that the parties were still bound by the Contract.

BrucePac contends that in the January 10, 2006 letter, Enjoy threw down the gauntlet and
demanded that BrucePac produce jerky using the illegal (pre-February 2006, two stage, open
damper) cooking method used by Enjoy.  However, that letter is not the smoking gun that
BrucePac contends.  That letter recognizes that a portion of the initial batch of jerky was
acceptable, although not prepared using Enjoy's (pre-February 2006 two stage, open damper)
cooking procedures:

> Throughout the 10 month period of your contract, you only
> delivered 19,000 lbs. (approximate) of beef jerky, of which only
> 13,200 lbs. (approximate) were accepted.  And, of the 13,200 lbs.
> accepted, none of it met the standard of production for which
> Enjoy is known in the industry, and none of it was manufactured
> "strictly in accordance with Enjoy's formulas/recipes and Enjoy's
> procedures", as required by your contract.

Kelly Supp Decl, Exhibit 6, p. 1.

The letter then notes that after Saab's visit to the Ferreira Int'l plant, BrucePac was able
to produce "acceptable" product:

> Mr. Saab personally visited your plant in Brazil, observed and
> corrected your production procedures, and was able to assist you in
> producing 3,000 lbs of acceptable product which was to have been
> immediately shipped by you to his plant in Fontana, California.

*Id* at 2.

The letter concludes with the following demands:

> Demand is hereby made upon you to immediately and *properly*
> manufacture and deliver to my client all unfilled orders made
> during the term of the contract.  Additionally, demand is hereby
> made upon you to immediately ship to my client the 3,000 lbs. of

> *acceptable jerky produced by your plant under Mr. Saab's*
> *supervision. . . .* [M]y client would prefer to try to salvage
> something from this contract by receiving the beef jerky product
> which you agreed to produce, manufactured in accordance with
> Enjoy's recipes and procedures, which you are capable of doing.

*Id* (emphasis added).

While this letter does use some of the Contract's terminology, it is not an unqualified

demand that BrucePac produce jerky using exactly the same (pre-February 2006 two stage, open

damper) procedures used by Enjoy prior to Saab's visit to Brazil. Instead, a fair reading of the

letter is that its authors (Saab and/or his attorney) believed that the jerky which was produced by

Ferreira Int'l under the "test deviation" was, in fact, acceptable product which BrucePac was

capable of producing in accordance with the terms of the Contract. In other words, it does not

reflect a demand that BrucePac revert to using the cooking procedure used by Saab prior to Saab

being told by Ferreira that his cooking procedure was illegal, but instead reflects Saab's

acquiescence to changes in the cooking procedure designed to make the product comply with

USDA regulations.

The record indicates that Enjoy first learned in February 2006 that its two-stage, open

damper cooking procedures violated USDA regulations when a USDA inspector advised

Quinzon of the changed regulations. This meeting came a month after the letter, at a time when

Saab was unaware that the jerky produced in the "test deviation" would not be acceptable under

USDA regulations. BrucePac points out that the jerky produced in the "test deviation" was

deemed unacceptable once it reached its plant in Wilsonville. However, the record indicates that

as late as December 21, 2005, even Ferreira believed that the procedures used in the "test

deviation" were legal, but that the cooking specifications would have to be changed in order to

reproduce the product using the acceptable cooking cycle. Ferreira Depo, p. 238.

At this juncture, this court is required to view the evidence in the light most favorable to

Enjoy. Viewed in that light, a fair reading of the evidence is that as of January 2006, Saab:

(1) was unaware that Enjoy's then-current cooking cycle did not comply with USDA regulations;

(2) authorized Ferreira Int'l to modify the cooking cycle for jerky prepared under the Contract as needed to ensure compliance with USDA requirements and regulations; (3) believed that the "test deviation" complied with USDA requirements and regulations; and (4) accepted the modified cooking procedures used to prepare the "test deviation." In sum, a genuine issue of material fact exists as to whether Enjoy demanded that BrucePac use Enjoy's allegedly illegal (pre-February 2006 two-stage, open damper) cooking cycle to prepare jerky under the Contract. Accordingly, BrucePac's request for summary judgment on the basis of impracticability based on illegal performance is denied.

## II. **Damages Limitation**

If BrucePac breached the Contract, then Oregon law entitles Enjoy to recover from BrucePac as damages "the difference between the cost of cover and the contract price together with any incidental or consequential damages as defined in ORS 72.7150." ORS 72.7120(2). Even if the Contract was not rendered illegal and unenforceable, BrucePac seeks partial summary on the issue of damages, arguing that recovery of either incidental or consequential damages is barred by the following clause in the Contract:

> 12. Consequential Damages: Neither party shall be liable for any [in]direct,[4] special, incidental, punitive or consequential damages, including but not limited to loss of data, business interruption, or loss of profits, arising out of the use of or the inability to use the products.

The parties raise several arguments relative to this provision. After consideration of each of those arguments, this court concludes that the consequential damages provision applies, but may be rendered unenforceable if a factfinder concludes that BrucePac breached the covenant of good faith and fair dealing.

///

///

---

[4] The parties agree that "direct" is a typographical error and should read "indirect."

15 - OPINION AND ORDER

### A. **"Inability to Use" Includes Failure to Deliver**

First, Enjoy contends that the clause is inapplicable in the context of this case because it only limits "damages . . . arising out of the use of or the inability to use the products." The alleged damages in this case arise out of BrucePac's failure or refusal to produce and deliver the beef jerky as required by the Contract. The issue is whether Enjoy suffered damages from "an inability to use" the jerky as a consequence of not having it.

"Consequential damages, as opposed to direct damages, do not arise directly according to the usual course of things from the breach itself; rather, they occur as a consequence of special circumstances known or reasonably supposed to have been contemplated by the parties when the contract was made." *Duyck v. Northwest Chemical Corp.*, 94 Or App 111, 116-17, 764 P2d 943, 946 (1988), *review denied*, 307 Or 405, 769 P2d 779 (1989), citing ORS 72.7150(2) (defining consequential damages). The Contract never envisioned that Enjoy would use the jerky itself. Instead, the only use of the product (beef jerky) contemplated by the parties when they executed the Contract was for Enjoy to resell it to consumers in the United States for a profit. Therefore, consequential damages as a result of "use," as used in this clause, can only refer to the resale of jerky by Enjoy.

If BrucePac produced and delivered unacceptable product, then Enjoy could not use the product by reselling it. Under that scenario, the clause clearly applies, and Enjoy could not recover its profits lost as a result of having no product to sell. The result should be no different if Enjoy could not resell the product because it was never produced and delivered. This was a short commercial contract of only nine months' duration for the purpose of Enjoy trying a new source. In that context, the consequential damages clause, premised as it is on the use or inability to use a product (which was never produced), does apply.

### B. **Failure of Essential Purpose**

Next, Enjoy argues that the consequential damages provision is unenforceable because it results in the failure of the Contract's essential purpose. Oregon law expressly allows resort to

the remedies of the Uniform Commercial Code if circumstances cause an exclusive or limited remedy provision to experience such a failure.  ORS 72.7190(2) ("Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in the Uniform Commercial Code").  Based on that law, Enjoy argues that all remedies under the Uniform Commercial Code are available for BrucePac's breach.

However, the failure of a remedy's essential purpose does not apply to a consequential damages clause, but instead applies to a clause that limits the available remedies, such as clauses limiting recovery to repair and replacement of the product or to the contract price.  In contrast, the Contract at issue here contains only a consequential damages clause, and no limited liability clause.

The cases cited by Enjoy involve contracts with both a consequential damages clause and a separate limited liability clause.  *Ragen Corp. v. Kearney & Trecker Corp.*, 912 F2d 619, 623 (3rd Cir 1990) (applying Wisconsin law)[5]; *Milgard Tempering, Inc. v. Selas Corp*, 902 F2d 703, 707-09 (9th Cir 1990) (applying Washington law); *RRX Indus. Inc. v. Lab-Con, Inc.*, 772 F2d 543, 547 (9th Cir 1985) (applying California law); *Young v. Hessel Tractor & Equip. Co.*, 99 Or App 262, 782 P2d 164 (1989), *rev. denied*, 309 Or 522, 789 P2d 1387 (1990) (applying Oregon law).  When both types of clauses are at play, the court must make an independent determination of whether the consequential damages cap should be lifted because the essential purpose of the contract has failed due to the limited liability clause.  The task of the court is to "examine the remedy provisions and determine whether [defendant's] default caused a loss which was not part of the bargained-for allocation of risk."  *Milgard*, 902 F2d at 709.  If so, the failure of essential purpose provision "provides an independent limit when circumstances render a damages limitation clause oppressive and invalid."  *RRX Indus., Inc.*, 772 F2d at 547 (citation omitted).  If the failure is so complete and total, the court may be inclined to lift the consequential damages

_____

[5] *Ragen* did not involve whether the consequential damages provision was actually incorporated into the agreement because the court concluded that the result was the same, entitling the plaintiff to consequential damages.  *Ragen*, 912 F2d at 623.

cap.  However, where – as here – the contract involves only a consequential damages clause, no argument can arise that the contract fails of its essential purpose, and the party challenging the clause must rely on some other reasoning to invalidate the clause.

This case involves no evidence that the clause was unconscionable when the Contract was executed.  Thus, this court turns to Enjoy's final argument that BrucePac may not enforce the consequential damages clause due to its own breach of the covenant of good faith and fair dealing.

### C.  Breach of Covenant of Good Faith and Fair Dealing

BrucePac acknowledges that a party's bad faith conduct may prevent that party from enforcing a clause that limits damages.  *See W.L. May Co., Inc. v. Philco-Ford Corp.*, 273 Or 701, 710, 543 P2d 283, 288 (1975); *Potomac Plaza Terraces Inc. v. QSC Prods., Inc.*, 868 FSupp 346, 353 (DDC 1994).  Although Enjoy alleges a breach of the implied and statutory covenant of good faith and fair dealing in its Second Claim for Relief, BrucePac contends that this case involves mere nonperformance and not bad faith.  This court disagrees and concludes that, viewed as a whole, the evidence in the record is sufficient to support a finding that BrucePac acted in bad faith by violating its duty of good faith and fair dealing.

Enjoy contends that BrucePac's act of producing only 13,000 pounds of acceptable jerky between April and November 2005 is itself evidence of bad faith given how much product the Contract contemplated would be produced.  A substantial difference exists between the quantity of jerky contemplated to be produced under the Contract and the amount of acceptable product actually delivered.  However, this court is not persuaded that this discrepancy is sufficient in and of itself to support a finding of bad faith.

Enjoy also contends that Bruce and Ferreira seriously overstated their experience when they met Saab in Brazil at the initial plant inspection and that BrucePac set the contract price with no due diligence, resulting in hardship on the Ferreira Int'l plant and pressure from Ferreira to "kill the deal" based on financial concerns.  While there is little evidence in the record

concerning the representations made by either side at that initial meeting, one reasonable inference from the immediate and significant price discrepancy between the contract price and the cost of production is that BrucePac seriously misjudged production costs.

A factfinder could reasonably conclude that BrucePac's willingness to carry through on its contractual obligations shifted when it became aware that the costs of production outstripped the contractual price. Documents and testimony support the conclusion that Enjoy repeatedly allowed modifications to its "formulas/recipes" in the form of product and supplier substitutions. Enjoy (through Saab) also agreed to modification of its "procedures" in order to comply with USDA requirements as late as the first week of November 2005 when Saab visited the plant and learned that the cooking method Enjoy/Saab wanted was illegal. The timing of the change in tenor by BrucePac concerning its obligation to perform is telling. Saab's visit to the plant came shortly after BrucePac learned that it was losing money under the contract. Edelson Decl, Exhibits 9-10. Soon thereafter, Ferreira determined that the suggestions Saab made during that plant visit would result in further increases in cost and reductions in productivity to Ferreira Int'l. *Id*, Exhibits 14, 16. Within weeks – and despite Saab's/Enjoy's willingness to not require strict compliance with Enjoy's formulas/recipes – Ferreira began hoping that Ferreira Int'l and BrucePac could "kill the deal." *Id*, Exhibits 17, 21. This evidence supports the inference that BrucePac, driven by cost concerns, decided to cease providing product to Enjoy and refused to work toward fulfilling its contractual obligations. When Saab sought to go to the Ferreira Int'l plant in Brazil in early November 2005, BrucePac attempted to extract from Enjoy a "last chance agreement," all the while not mentioning any problem meeting the USDA regulations, and apparently silently producing a "test deviation" that BrucePac knew could not be sold in the United States.

BrucePac's responds that the actions of Ferreira and Ferreira Int'l may not be attributed to BrucePac. However, all parties knew who was making the jerky (Contract, ¶ 1); Ferreira was putting significant pressure on BrucePac; and BrucePac was responding, finally deciding to cut

and run from a losing commercial transaction of its own making. Viewed as a whole, the evidence in the record is sufficient to support a breach of the implied covenant of good faith and fair dealing. A finding of such a breach would preclude BrucePac from enforcing the consequential damages provision. Accordingly, summary judgment is inappropriate pending resolution of the factual question regarding BrucePac's good faith or lack thereof.

## **ORDER**

For the reasons stated above, defendant's Motion for Summary Judgment (docket #29) is DENIED.

DATED this 19th day of September, 2007.

__/s/ Janice M. Stewart _____
Janice M. Stewart
United States Magistrate Judge